**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| RYAN DODGSON, derivatively on behalf of ALFI, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| PAUL PEREIRA, DENNIS MCINTOSH, CHARLES PEREIRA, PETER BORDES, JOHN M. COOK, II, JUSTIN ELKOURI, ALLISON FICKEN, JIM LEE, RICHARD MOWSER, and FRANK SMITH, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ALFI, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Ryan Dodgson ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Alfi, Inc. ("Alfi" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Paul Pereira ("P. Pereira"), Dennis McIntosh ("McIntosh"), Charles Pereira ("C. Pereira"), Peter Bordes ("Bordes"), John M. Cook, II ("Cook"), Justin Elkouri ("Elkouri"), Allison Ficken ("Ficken"), Jim Lee ("Lee"), Richard Mowser ("Mowser"), and Frank Smith ("Smith") (collectively, the "Individual Defendants" and with Alfi, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Alfi, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee,

Mowser, and Smith for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); against Defendants P. Pereira, McIntosh, Bordes, Cook, Elkouri, Ficken, Lee, Mowser, and Smith for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Exchange Act; and against Defendants P. Pereira and McIntosh for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Alfi, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Alfi's directors and officers from May 4, 2021 through the present (the "Relevant Period").

2.      Alfi is an advertising solutions provider based in Miami Beach, Florida that focuses on the "digital out of home" ("DOOH") advertising market. Using cameras on tablets or kiosks, the Company's technology makes determinations as to the age, gender, ethnicity, geolocation, and emotion of individuals standing in proximity to Alfi-enabled devices and then delivers advertisements based on the viewer's ascertained demographic and psychographic profile. The Company was founded in 2018 by Defendants P. Pereira, C. Pereira, and Cook.

3.      On January 8, 2021, the Company filed its registration statement on Form S-1 with

the SEC, which was subsequently amended seven times and declared effective on May 3, 2021 (the "Registration Statement"). On May 5, 2021, the Company filed a prospectus on Form 424B4, which formed a part of the Registration Statement (the "Prospectus," and together with the Registration Statement, the "Offering Documents").

4.    The Company's stock began trading on the Nasdaq Capital Market ("NASDAQ") on May 4, and the initial public offering ("IPO") was completed on May 6, 2021. The Company sold 4.29 million shares of common stock and 4.29 million warrants in the IPO, receiving $17.8 million in gross proceeds before deducting underwriting discounts, commissions, and other expenses.

5.    In the Offering Documents and in subsequent statements during the Relevant Period, the Individual Defendants made, or caused Alfi to make, materially false and misleading statements concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that certain of the Individual Defendants had caused or permitted the Company to engage in certain corporate transactions without Board approval (the "Improper Transactions").

6.    The Improper Transactions included, at least: (1) the purchase of a condominium in Miami Beach, Florida (the "Condominium") for $1.1 million; (2) a commitment to sponsor a sports tournament (the "Tournament") for two years in the amount of $640,000; and (3) agreements with three separate vendors that pertained to investor relations, financial and business advice, and a start-up call center for customer service.

7.    Furthermore, throughout the Relevant Period, Defendants P. Pereira, McIntosh, and C. Pereira engaged in a pattern and practice of abusing their control of the Company, including by making false and misleading statements concerning the Company's operations and prospects,

using Company resources without authorization, and interfering with an independent internal investigation (the "Control Misconduct"). The Individual Defendants also made, or caused Alfi to make, materially false and misleading statements that failed to disclose this.

8.      In addition to failing to disclose the Company's engagement in the Improper Transactions and Defendant P. Pereira's, McIntosh's, and C. Pereira's engagement in the Control Misconduct, the Individual Defendants failed to disclose that the Company had deficient internal controls and that—as a result of the Improper Transactions, the Control Misconduct, and the Company's deficient internal controls—the Company faced a heightened risk of regulatory scrutiny, reputational harm, difficulties in timely filing reports with the SEC, and other harms and costs.

9.      The Individual Defendant's misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock in the IPO and throughout the Relevant Period, during which time the Individual Defendants caused Alfi to repurchase 137,650 of its own shares at artificially inflated prices, harming the Company.

10.     The truth began to emerge after the market closed on October 28, 2021, when the Company disclosed in a Form 8-K filed with the SEC that the Board of Directors (the "Board") had placed Chief Executive Officer ("CEO") P. Pereira, Chief Financial Officer ("CFO") McIntosh, and Chief Technology Officer ("CTO") C. Pereira on administrative leave effective October 22, 2021, and had terminated Defendant C. Pereira's employment effective October 28, 2021. The Company also announced that the Board had authorized an independent internal investigation (the "Investigation") regarding certain corporate transactions and other matters. On this news, the price per share of the Company's common stock declined $1.24, or approximately 22%, to close at $4.42 on October 29, 2021.

11.     On November 1, 2021, the Company filed another current report on Form 8-K with the SEC, revealing that the Company's independent registered public accounting firm, Friedman LLP ("Friedman"), had resigned. The November 1, 2021 Form 8-K further disclosed that Defendant Mowser, then a member of the Board, had resigned on October 27, 2021 due to his disagreement with the manner in which the Board decided to replace the CEO, CFO, and CTO. The November 1, 2021 8-K also identified and described certain of the Improper Transactions, and it noted deficiencies in the Board's oversight of the Improper Transactions, stating: "These transactions were undertaken by the Company's management without sufficient and appropriate consultation with or approval by the Board."

12.     The full truth emerged on November 15, 2021. First, the Company disclosed in a Form 8-K filed with the SEC that it had received a document preservation request from the SEC related to an "ongoing investigation" conducted by SEC staff. The Company also filed a notification of late filing on Form 12b-25 with the SEC, advising that it would be unable to timely file its quarterly report for the fiscal quarter ended September 30, 2021. In the Form 12b-25, the Company noted that it anticipated a "significant change" in its results for the quarter ended June 30, 2021, in part because the Company "was party to material transactions which are expected to result in significant one-time expenses." On this news, the price per share of the Company's stock declined $0.24 to close at $4.37 per share on November 16, 2021, a loss of 5%.

13.     On February 3, 2022, the Company announced that Defendants P. Pereira and McIntosh resigned from all positions at the Company on February 2, 2022.

14.     On February 23, 2022, the Company filed a current report on Form 8-K with the SEC that included a summary of the Investigation's principal findings. The Form 8-K detailed the Improper Transactions and Defendants P. Pereira's, McIntosh's, and C. Pereira's engagement in

the Control Misconduct. The Form 8-K further noted the Investigation's finding that the Company had deficient internal control over financial reporting, and it announced certain recommendations and steps the Company was taking to remediate the issues identified in the Investigation.

15.    On March 11, 2022, the Company filed another current report on Form 8-K with the SEC which announced that the Company faced a liquidity problem and that previously issued interim financial statements included in two of the Company's quarterly reports filed with the SEC should no longer be relied upon because of accounting errors.

16.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements and/or omissions of material fact. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company had engaged in the Improper Transactions; (2) Defendants P. Pereira, McIntosh, and C. Pereira had engaged in the Control Misconduct; (3) the Company failed to maintain adequate disclosure controls and procedures and internal control over financial reporting; (4) as a result of the foregoing, the Company faced an increased risk of internal and regulatory investigations; (5) once revealed, all of the foregoing was likely to have a material negative impact on Alfi's reputation, finances, and ability to timely file reports with the SEC. As a result of the foregoing, Alfi's public statements were materially false and misleading at all relevant times.

17.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

18.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully

or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

19.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Specifically, the Company completed a buyback of 137,650 shares on July 9, 2021 at an average price of $14.5296 per share. As the Company's stock was only worth $4.37 per share during that time, the price at closing on November 16, 2021, the Company overpaid by approximately $1.4 million.

20.     The Individual Defendants also breached their fiduciary duties to the Company by causing or permitting the Company to engage in the Improper Transactions and by permitting the Control Misconduct, and Defendants P. Pereira, McIntosh, and C. Pereira breached their fiduciary duties by engaging in the Control Misconduct.

21.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former CEO, interim CEO, former CFO, Chief Business Development Officer ("CBDO"), and five current or former Company directors to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Florida (the "Securities Class Action") and which has further subjected the Company to the need to undertake the Investigation, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

22.     The Company has been substantially damaged as a result of the Individual

Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Bordes', Ficken's, Lee's, and Smith's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)), Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act and the Securities Act.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. Furthermore, the Company's principal

executive offices are located in this District.

**PARTIES**

**Plaintiff**

28.     Plaintiff is a current shareholder of Alfi. Plaintiff has continuously held Alfi common stock at all relevant times.

**Nominal Defendant Alfi**

29.     Alfi is a Delaware corporation with its principal executive offices at 429 Lenox Avenue, Suite 547, Miami Beach, Florida 33139. Alfi's shares trade on the NASDAQ under the ticker symbol "ALF."

**Defendant P. Pereira**

30.     Defendant P. Pereira is a cofounder of the Company and served as the Company's Chairman, President, and CEO from April 2018 until February 2, 2022. He is the father of Defendant C. Pereira. According to the Prospectus, as of May 3, 2021, Defendant P. Pereira beneficially owned 1,764,032 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $2.90 on May 4, 2021, the first day of trading, Defendant P. Pereira owned approximately $5.1 million worth of Alfi stock.

31.     According to the Prospectus, the Company entered into an employment agreement with Defendant P. Pereira on February 10, 2021 entitling him to a base salary of $300,000. Under the same agreement, he became eligible for stock awards, other benefit plans, and discretionary bonuses at the Board's discretion with a target amount equal to 30% of base salary.

32.     The Prospectus stated the following about Defendant P. Pereira:

**Paul Pereira, DBA.** Dr. Paul Antonio Pereira has served as our Chairman, President and Chief Executive Officer since April 2018. Dr. Pereira has over 30 years' experience in technology, telecommunications, transportation, manufacturing and biotechnology. Dr. Pereira has led successful business initiatives across the United States and overseas, including founding the first ISP in

the Caribbean leading to the deregulation of the Cable and Wireless 40-year-old telecom monopoly and simultaneously opening up the markets for major call centers in multiple Caribbean islands. Dr. Pereira led the turnaround and restructuring for the Palestinian Telecommunication Company (PALTEL) and also served as a founding director of Vtel, a multibillion telecommunications company based in Dubai and Amman Jordan, and successfully lead multiple acquisitions in the MENA region.

From 2010 through March 2016, Dr. Pereira was the Chief Executive Officer at Alton Consulting Group, where he reengineered multiple firms to a renewable and sustainable transition for the new Bio Economy. From August 2013 to November 2015, Dr. Pereira also served as the Chief Executive Officer and Executive Chairman of MHG (Danimer Scientific) where he spearheaded a turnaround from bankruptcy to a multi-million buyout offer in two years which eventually ended up with a SPAC acquisition on NYSE (DNMR) in December 2020 at an enterprise valuation of $890 million. From July 2016 to July 2017, Dr. Pereira served as Chief Executive Officer of Uniwell Labs where he developed and directed strategy for Chapter 11 reorganization with a successful exit six months later. Dr. Pereira has also served as a professor from September 2014 teaching the graduate level business courses at ISEG Business and Finance school in Paris, France.

Dr. Pereira graduated with an Ontario Scholarship in 1978 from Ridley College and studied Chemistry at McGill University in Canada (Sept 1978 to June 1981), and further studied Mechanical Engineering at Texas Agricultural and Mechanical University in the United States in 1984. Dr. Pereira earned a Doctorate of Business Administration (DBA) in August 2014 from the International School of Management Paris and St. John's University, New York.

We believe Dr. Pereira's vast and varied business experience qualifies him to serve on our Board of Directors.

**Defendant McIntosh**

33.     Defendant McIntosh served as the Company's CFO from October 2020 until February 2, 2022. According to the Prospectus, as of May 3, 2021, Defendant McIntosh beneficially owned 63,002 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $2.90 on May 4, 2021, the first day of trading, Defendant McIntosh owned approximately $182,706 worth of Alfi stock.

34.     According to the Prospectus, the Company entered into an employment agreement

with Defendant McIntosh on February 10, 2021 entitling him to a base salary of $225,000. Under the same agreement, he became eligible for stock awards, other benefit plans, and discretionary bonuses at the Board's discretion with a target amount equal to 30% of base salary.

35.     The Prospectus stated the following about Defendant McIntosh:

**Dennis McIntosh, MBA/CPA,** Mr. McIntosh has served as our Chief Financial Officer since October 2020. Mr. McIntosh has years of experience in both private and public companies in a various range of industry groups. Mr. McIntosh has led multiple start-up companies through successful sales of the companies and has led the due diligence on 25+ acquisitions/divestures representing $1.9 billion in investor funds and is proficient in accounting, finance, and treasury and cash forecasting (designed/implemented several companywide multi-national cash forecasting processes). In the investment management industry, Mr. McIntosh directed the conversion of $700 million in home loans into a public traded portfolio, thus reducing the portfolio risk and achieving the targeted asset to liabilities match and serves as a board of director member on several companies.


Since 2019, Mr. McIntosh has served as the managing partner at Prosperity Partners Consultancy, LLC where he advises companies on a range of growth strategies, including preparing companies for sale or acquisition integration. From 2015 to 2019, Mr. McIntosh served as a partner at B2B CFO Partners, LLC where he also served clients by solving capital issues. From 2014 to 2015, Mr. McIntosh served as the Chief Financial Officer of Success Academy Charter Schools Inc. where he instituted a variety of financial infrastructure, provided financial guidance, and served on the executive team which resulted in launch of 39 new schools, increasing revenue from $80 million to $300 million and students from 6,000 to 15,000.

Mr. McIntosh earned his Bachelor of Art degree with honors from Andrews University in 1977. Mr. McIntosh earned his Masters in Business Administration from the University of Connecticut in 1981. Mr. McIntosh, in addition to being a CPA, is certified in International Financial Reporting Standards (IFRS), Not for Profit accounting (NFP), and is a Chartered Global Management Accountant (CGMA).

## **Defendant C. Pereira**

36.     Defendant C. Pereira is a cofounder of the Company and served as the Company's CTO from April 2018 until October 28, 2021. He is the son of Defendant P. Pereira. According to the Prospectus, as of May 3, 2021, Defendant C. Pereira beneficially owned 409,508 shares of the

Company's common stock. Given that the price per share of the Company's common stock closed at $2.90 on May 4, 2021, the first day of trading, Defendant McIntosh owned approximately $1.2 million worth of Alfi stock.

37.     According to the Prospectus, the Company entered into an employment agreement with Defendant C. Pereira on February 10, 2021 entitling him to a base salary of $250,000. Under the same agreement, he became eligible for stock awards, other benefit plans, and discretionary bonuses at the Board's discretion with a target amount equal to 30% of base salary.

38.     The Prospectus stated the following about Defendant C. Pereira:

**Charles Raglan Pereira,** Mr. Pereira has served as our Chief Technology Officer since April 2018**.** Mr. Pereira oversees multiple engineering and coding resources for the Company, including our Belfast office team. Mr. Pereira initiated the design, development and launch of Alfi's machine learning and deep learning models. Mr. Pereira has also worked with MIT's laboratory of manufacturing productivity for the purpose of implementation of an innovative enterprise resource planning software, utilizing RFID in a garment manufacturing process.

Mr. Pereira earned his Bachelor of Science in Business Administration in 2016 from the University of Miami. Charles attended Udacity University from January 2017 to August 2017 and completed a Nano Degree in Artificial Intelligence specializing in computer vision.

**Defendant Bordes**

39.     Defendant Bordes served as a director throughout the Relevant Period and was appointed Interim CEO on October 22, 2021, a position in which he still serves. According to the Prospectus, as of May 3, 2021, Defendant Bordes beneficially owned 31,501 shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $2.90 on May 4, 2021, the first day of trading, Defendant Bordes owned approximately $91,353 worth of Alfi stock.

40.     According to the Company's Form 8-K/A filed on December 30, 2021, Defendant Bordes receives a salary of $300,000 per year.

41.     The Prospectus stated the following about Defendant Bordes:

**Peter Bordes** is a lifelong entrepreneur with a 30+ year career as a founder, CEO, investor and Board Member in private and public companies focused in media, ad tech, technology, finance and venture investing focused on disruptive innovation.

Since March 2012, Mr. Bordes has been a managing partner at Trajectory Capital, investing in disruptive innovation driving global transformation from Seed thru IPO. From May 2019 to October 2020, Mr. Bordes was CEO of Kubient, a cloud advertising platform with artificial intelligence ad fraud prevention, that he led from private to IPO on the (NASDAQ:KBNT), and currently sits on the Kubient's Board of Directors.

Mr. Bordes serves on the Board of Directors of Beasley Media (NASDAQ: BBGI), fraud.net, Hoo.be and as Vice Chairman of Ocearch. He is a co-founder and serves on the Board of Directors of TruVest, and MainBloq.

Prior to forming Trajectory Capital, Mr. Bordes was a co-founder, CEO, and Chairman of MediaTrust, an RTB performance marketing ad exchange, which was the ninth fastest growing company in the United States under his leadership. During his tenure in the performance marketing industry he was a founding member and Chairman of the PMA Performance Marketing Association.

Before founding MediaTrust Mr. Bordes was a managing partner of Mason Cabot an early stage tech investment bank.

Mr. Bordes was ranked in the top 100 most influential angel investors and business leaders in the United States on social media and is a member of the Thiel Foundation 20 Under 20 Mentor Program. He is a member of the Board of Trustees of the Brooklyn Music School. Mr. Bordes earned his bachelor's degree in Communication, Business and Media Studies from New England College.

We believe Mr. Bordes vast experience with technology companies and in helping guide them through multiple stages of growth, as well as his experience as a public company director qualifies him to serve on our Board of Directors.

**Defendant Cook**

42.     Defendant Cook is a cofounder of the Company and has served as the Company's CBDO since October 2020. He also served as a director prior to the IPO, until its completion on May 6, 2021. In addition, he served as the Company's CFO from April 2018 until October 2020. According to the Prospectus, as of May 3, 2021, Defendant Cook beneficially owned 1,417,526

shares of the Company's common stock. Given that the price per share of the Company's common stock closed at $2.90 on May 4, 2021, the first day of trading, Defendant Cook owned approximately $4.1 million worth of Alfi stock.

43.     According to the Prospectus, the Company entered into an employment agreement with Defendant Cook on February 10, 2021 entitling him to a base salary of $225,000. Under the same agreement, he became eligible for stock awards, other benefit plans, and discretionary bonuses at the Board's discretion with a target amount equal to 30% of base salary.

44.     The Prospectus stated the following about Defendant Cook:

**John M. Cook, II,** Mr. Cook has served as our Chief Business Development Officer since October 2020. Prior to that, Mr. Cook served as our Chief Financial Officer from April 2018 until October 2020. Mr. Cook is a Wall Street veteran with over 24 years of experience and expertise in Investment Banking, Capital Markets, and Commercial banking both domestic and abroad.

From July 2005 to March 2018 Mr. Cook served as Senior Portfolio Manager for a Private Family Office with a primary investment focus on U.S. Capital Markets. Prior to that, Mr. Cook served as an Investment Banker and Financial Consultant gaining vast experience in the Investment Banking and Capital Markets space with respect to publicly traded companies and his keen understanding of the financial markets.

Mr. Cook attended Five Towns College.

On September 3, 2002, the SEC Admin Release 34-46447, issued a release in reference to Mr. Cook. On December 12, 2001, the Commission filed a complaint in the United States District Court for the Southern District of Florida Case No. 01-7874 (S.D. Fla.), alleging, among other things, that Mr. Cook violated the registration, antifraud, and broker-dealer registration provisions of the federal securities laws by selling unregistered securities and by offering and selling the securities in exchange for sales commissions without the knowledge or approval of the registered broker-dealers which he was associated with and by continuing to offer and sell the securities when he was no longer associated with the registered broker-dealer. On March 27, 2002, a final judgment permanently enjoined Mr. Cook from violating sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 and Sections 10(b) and 15(a) of the Exchange Act and Rule 10b-5 thereunder. Mr. Cook consented to the entry of the Final Judgment without admitting or denying the allegations contained in the Commission's report.

Mr. Cook will be resigning from the Board of Directors effective upon completion of this offering.

**Defendant Elkouri**

45.    Defendant Elkouri served as a Company director prior to the IPO until its completion on May 6, 2021. Defendant Elkouri signed the Registration Statement.

46.    The Prospectus stated the following about Defendant Elkouri:

**Justin Elkouri,** is an experienced industry executive who brings a wide range of knowledge and expertise to businesses across several platforms and industry sectors.

Mr. Elkouri has served as the Chief Legal Officer for David Murfin and Murfin, Inc. in Wichita, Kansas since 2013. At Murfin, Inc., Mr. Elkouri has led various business transactions around the world—including transactions related to the following: Lee Aerospace in Wichita, Kansas, Air Capital Flight Line's acquisition and re-development of the legacy Boeing Facility, operating the first Pizza Hut franchisees in Lusaka, Zambia and Kampala, Uganda, the construction and management of Mushandi berry farm in Zimbabwe, and the development of Wichita State University's Innovation Campus.

Mr. Elkouri also serves on the boards of Executive Airshare, LLC and Air Capital Filtration, LLC. Mr. Elkouris also serves on the boards of several charitable, educational and not-for-profit groups, including the Sedgwick County Zoo Foundation.

Mr. Elkouri received his Bachelor of Science in Business Administration from the University of Kansas in 2005. Mr. Elkouri received his Juris Doctorate from the University of Kansas School of Law in 2008, and his Masters of Law in Taxation from New York University in 2009.

Mr. Elkouri will be resigning from the Board of Directors effective upon completion of this offering.

**Defendant Ficken**

47.    Defendant Ficken has served as a Company director since before the IPO. During the Relevant Period, she served on all three of the Board's committees, including as Chair of the Compensation Committee.

48.    In connection with her service as a director, on the effective date of the IPO,

Defendant Ficken was granted options to purchase shares of common stock at a per share exercise price equal to the price of the shares of common stock in the IPO.

49.    The Prospectus stated the following about Defendant Ficken:

**Allison Ficken,** has been a partner at the law firm of Dovin Ficken LLC since January 2015. Ms. Ficken practices primarily in the areas of commercial arbitration, securities litigation/arbitration, and business litigation.

Ms. Ficken earned her Bachelor of Science from Wake Forest University in 1981 with honors. Ms. Ficken earned her Juris Doctor, with honors, from the University of Georgia School of Law in 1981.

We believe Ms. Ficken's knowledge of securities laws and business experience qualifies her to serve on our Board of Directors.

**<u>Defendant Lee</u>**

50.    Defendant Lee served as a Company director throughout the Relevant Period and assumed the role of Chairman on October 22, 2021. Defendant Lee is the founder, president, and chairman of Lee Aerospace, Inc. ("Lee Aerospace"), which beneficially owned 36.9% of the Company following the IPO. According to the Prospectus, as of May 3, 2021, Defendant Lee beneficially owned 4,347,079 shares of the Company's common stock, which consisted of shares of common stock issuable upon conversion of the Company's Series Seed Preferred Stock and 1,197,021 shares of common stock issued pursuant to certain bridge loans. Given that the price per share of the Company's common stock closed at $2.90 on May 4, 2021, the first day of trading, Defendant Lee owned approximately $12.6 million worth of Alfi stock. Defendant Lee disclaims beneficial ownership of such shares, which relate to his control over Lee Aerospace, Inc. As a result of Defendant Lee's beneficial ownership of the Company, his role as Chairman, and his control of Lee Aerospace, Inc., Defendant Lee is a controlling shareholder of the Company.

51.    In connection with his service as a director, on the effective date of the IPO, Defendant Lee was granted options to purchase shares of common stock at a per share exercise

price equal to the price of the shares of common stock in the IPO.

52.     Under Defendant Lee's direction and control, Lee Aerospace entered into bridge loan agreements with the Company and certain other persons on December 30, 2020 ($1.7 million), March 22, 2021 ($100,000), and April 1, 2021 ($100,000).

53.     The Prospectus stated the following about Defendant Lee:

**Jim Lee,** is a Wall Street veteran with more than 25 years of experience in all aspects of the banking and finance industry spectrum. Mr. Lee has been the founder, President and Chief Executive Officer of Lee Aerospace, Inc., a transparency manufacturer for the aerospace industry since 1987. Mr. Lee has diversified Lee Aerospace to include the manufacturing of full-fuselage builds, and complex composite parts, details, and assemblies. In addition, Lee Aerospace has expanded its position in the market through strategic investments and partnerships both inside and outside the aviation industry.

With a passion for aviation at an early age, Mr. Lee graduated from Spartan School of Aeronautics in 1979. In addition, as a multi-engine instrument pilot, he has accumulated over 5,000 hours.

We believe Mr. Lee's experience growing and running a company qualifies him to serve on our Board of Directors.

**Defendant Mowser**

54.     Defendant Mowser served as a Company director from the period prior to the IPO until his resignation on October 27, 2021. During the Relevant Period, he served on all three of the Board's committees, including as Chair of the Audit Committee.

55.     In connection with his service as a director, on the effective date of the IPO, Defendant Mowser was granted options to purchase shares of common stock at a per share exercise price equal to the price of the shares of common stock in the IPO.

56.     The Prospectus stated the following about Defendant Mowser:

**Richard Mowser,** serves as our Audit Committee expert. Mr. Mowser is an experienced industry expert with over 30 years' experience in the hospitality profession. Since May 2018, Mr. Mowser has served as a food and beverage consultant at Crown Point Beach Resort where he restructured and rebranded the

restaurant resulting in increased revenue by 400% with second year improvement up 25% year on year. From May 2012 to May 2018, Mr. Mowser served as the Chief Executive Officer of Queen's Park Cricket Club where he developed and executed a strategic business plan resulting in increased revenues of $17 million from 2012 to 2013 to $25 million in 2015 to 2016.

Mr. Mowser earned his undergraduate degree from Greshams School UK in 1977. Mr. Mowser is also an AAT level 1, graduating from London School of Accountancy in 1979 and served as an auditor with Deloitte and Touche for several years.

We believe that Mr. Mowser's financial expertise qualifies him to serve on our Board of Directors.

**Defendant Smith**

57.     Defendant Smith has served as a Company director since before the IPO. During the Relevant Period, he served on all three of the Board's committees, including as Chair of the Nominating and Corporate Governance Committee.

58.     In connection with his service as a director, on the effective date of the IPO, Defendant Smith was granted options to purchase shares of common stock at a per share exercise price equal to the price of the shares of common stock in the IPO.

59.     The Prospectus stated the following about Defendant Smith:

**Frank Smith,** is an attorney and has run his own law firm FMS Lawyer PL since 2010. Mr. Smith's areas of practice include civil, administrative, and criminal litigation, as well as legal services related to contracts, corporate governance, compliance, insurance, employment and human resources issues, real estate, financing, mergers and acquisitions and the creation and protection of intellectual property. With over 27 years of legal experience, Mr. Smith has served as an attorney in Florida where he has helped clients resolve multi-year intra-family corporate governance disputes, successfully win millions of dollars for clients in breach of contract disputes, as well as general corporate counseling for his clients.

Mr. Smith earned his Bachelor of Arts from Franklin and Marshall College in 1988. Mr. Smith earned his Juris Doctor from Hofstra University School of Law in 1993.

We believe Mr. Smith's experience in providing a broad range of legal services to businesses qualifies him to serve on our Board of Directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Alfi and because of their ability to control the business and corporate affairs of Alfi, the Individual Defendants owed Alfi and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Alfi in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Alfi and its shareholders so as to benefit all shareholders equally.

61.     Each controlling shareholder, director, and officer of the Company owes to Alfi and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Alfi, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the controlling shareholder, officers, and directors of Alfi were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder,

directors, and officers of Alfi, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Alfi's Board at all relevant times.

65.     As the controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

66.     To discharge their duties, the controlling shareholder, officers, and directors of Alfi were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and directors of Alfi were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States,

and pursuant to Alfi's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Alfi conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Alfi and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Alfi's operations would comply with all applicable laws and Alfi's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth

above.

67.     Each of the Individual Defendants further owed to Alfi and the shareholders the duty of loyalty requiring that each favor Alfi's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

68.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Alfi and were at all times acting within the course and scope of such agency.

69.     Because of their advisory, executive, managerial, directorial, and controlling positions with Alfi, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

70.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Alfi.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, as well as the violations of the Exchange Act and Securities Act alleged in the Securities Class Action; (ii)

conceal adverse information concerning the Control Misconduct as well as the Company's operations, engagement in the Improper Transactions, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

73.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Alfi was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

75.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Alfi, and was at all times acting within the course and scope of such agency

## **ALFI'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

### *Alfi's Code of Conduct*

76.     The Code of Conduct's introduction states as follows, in relevant part:

The Company requires the highest standards of professional and ethical conduct

from its employees, officers and directors. Our reputation for honesty and integrity is key to the success of its business. The Company intends that its business practices will comply with the laws of all of the jurisdictions in which it operates and that honesty, integrity and accountability will always characterize the Company's business activity. No employee, officer or director may achieve results through violations of laws or regulations or unscrupulous dealings.

77.     In a section titled "Conflicts of Interest," the Code of Conduct states that "if you become aware of a conflict or potential conflict involving another employee, officer or director, you should bring it to the attention of the Secretary or a member of the Audit Committee of the Board of Directors at the principal executive offices of the Company." The Code of Conduct states that conflicts of interest may arise in the following situations:

- You cause the Company to engage in business transactions with a company that you, your friends or your relatives control without having obtained the appropriate prior approvals required.
- You are in a position to (i) compete with, rather than help, the Company or (ii) make a business decision not on the basis of the Company's interest but rather for your own personal advantage.
- You take actions, or have personal or family interests, which may make it difficult to perform your work (or discharge your duties and obligations) effectively.
- You, or any of your family members or affiliates, receive improper personal benefits other than gratuities and payments received or provided in compliance with the guidelines set forth in "Gifts and Entertainment" below, as a result of your position in the Company.

78.     In a section titled "Public Reporting," the Code of Conduct emphasizes the importance of accurate public disclosures, stating as follows:

Full, fair, accurate and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications. Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws and meets the expectations of its stockholders.

79.     In the same section, the Code of Conduct describes guidelines for those at the Company who are responsible for the preparation of public reports:

Persons responsible for the preparation of such documents and reports and other

public communications must exercise the highest standard of care in accordance with the following guidelines:

- all accounting records, and the reports produced from such records, must comply with all applicable laws;
- all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;
- all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;
- accounting records must not contain any false or intentionally misleading entries;
- no transactions should be intentionally misclassified as to accounts, departments or accounting periods;
- all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;
- no information should be concealed from the internal auditors or the independent auditors; and
- compliance with the Company's internal control over financial reporting and disclosure controls and procedures is required.

80.    In a section titled "Protection and Proper Use of Company Assets," the Code of

Conduct provides as follows, in relevant part:

All employees, officers and directors should promote and ensure the efficient and responsible use of the Company's assets and resources by the Company. Theft, carelessness and waste have a direct impact on the Company's profitability. Any suspected incidents of fraud or theft should be immediately reported for investigation.

81.    In a section titled "Compliance with Laws, Rules and Regulations," the Code of

Conduct provides as follows:

Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company, including any securities exchange or other organization or body that regulates the Company, is critical to our reputation and continued success. All employees, officers and directors must respect and obey the laws of the cities, states and countries in which the Company operates and avoid even the appearance of impropriety.

Employees, officers or directors who fail to comply with this Code and applicable laws will be subject to disciplinary measures, up to and including discharge from the Company.

***Audit Committee Charter***

82. The Company's Audit Committee operates according to The Charter of the Audit Committee of Alfi, Inc. (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee "is to oversee the Company's accounting and financial reporting processes and the audit of the Company's financial statements." It further states that the "primary role of the [Audit] Committee is to oversee the financial reporting and disclosure process."

83. The Audit Committee Charter also provides that the Audit Committee is tasked with reviewing the following with management and the Company's independent auditors:

> any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles; any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements.

84. In addition, the Audit Committee Charter states that the Audit Committee is tasked with reviewing the following with management and the Company's independent auditors:

> the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures, and review and discuss with management and the Company's independent auditors disclosure relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

85. The Individual Defendants violated the Code of Conduct and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false

and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and failing to report the same. The Individual Defendants further violated the Code of Conduct when they caused the Company to waste corporate assets by repurchasing shares of its common stock at prices that were artificially inflated due to the false and misleading statements described herein. Moreover, the Individual Defendants violated the Code of Conduct by causing or permitting the Company to engage in the Improper Transactions, and by engaging in or permitting the Control Misconduct. Further in violation of the Code of Conduct and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

86.     Defendants Ficken, Mowser, and Smith served on the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Ficken, Mowser, and Smith conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Ficken, Mowser, and Smith failed to adequately oversee the Company's accounting and financial reporting processes, the audit of the Company's financial statements. Furthermore, Defendants Ficken, Mowser, and Smith failed to oversee, address, and remediate major issues regarding the presentation of the Company's financial statements. Moreover, they violated the Audit Committee

Charter by causing or permitting the Company to engage in the Improper Transactions, and by permitting the Control Misconduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

87.    Alfi is a Delaware corporation with its principal executive offices in Miami Beach, Florida. The Company was founded in 2018 by Defendants P. Pereira, C. Pereira, and Cook.

88.    The Company operates in the DOOH advertising marketplace. Using cameras, artificial intelligence, and data analytics, the Company's technology makes determination as to the age, gender, ethnicity, mood, and other characteristics of nearby individuals. With this information, the Company delivers advertisements targeted to match the identified demographic information.

89.    The Company's IPO closed on May 6, 2021. The Company sold 4.3 shares of common stock and 4.3 warrants for aggregate gross proceeds of approximately $17.8 million before deducting underwriting commissions, discounts, and offering expenses.

90.    Throughout the Relevant Period, the Individual Defendants caused the Company to make false and misleading statements that failed to disclose the Improper Transactions and the Control Misconduct and that, as a result, the Company faced an increased risk of regulatory enforcement and material negative financial impacts. These misstatements and omissions of material fact had the effect of inflating the price of the Company's common stock during the Relevant Period, in which the Individual Defendants caused the Company to repurchase 137,650 shares of its own stock at artificially inflated prices.

91.    Defendants P. Pereira, McIntosh, and C. Pereira engaged in the Control Misconduct and caused the Company to engage in the Improper Transactions, while the Board completely abdicated its duty to exercise oversight over the Company's affairs and caused or permitted the

Company to engage in the Improper Transactions.

92.     On October 22, 2021, the Board authorized an independent investigation into the Control Misconduct and the Improper Transactions. The investigatory phase of the Investigation concluded on or before February 23, 2022.

**The Control Misconduct**

93.     As noted in the Company's SEC filings, the Investigation found that the Company's former senior management caused the Company to enter into the Improper Transactions without Board approval, demonstrating that the members of the Board were abdicating their fiduciary duties to the Company to exercise adequate oversight.

94.     On July 12, 2021, the Company signed a contract to acquire the Condominium for $1.1 million in Miami Beach Florida, which purchase was completed on August 12, 2021. According to the Company's February 23, 2022 Form 8-K, the purchase was executed without the knowledge or approval of the Board. In connection with the purchase, Defendant P. Pereira signed a certification with Miami-Dade County falsely stating that the Board and Alfi's shareholders had approved the purchase. The Condominium was then transferred to a limited liability company controlled by Defendants P. Pereira and McIntosh. In connection with the Investigation, the Condominium was transferred back to the Company, which has commenced the process of selling the Condominium.

95.     Additionally, the Company's former senior management caused the Company to commit to sponsor the Tournament for two years in the amount of $640,000, which amount the Company paid half in cash and half through the issuance of 31,368 shares of common stock. According to the Company's February 23, 2022 Form 8-K, the sponsorship agreement was executed, the cash fee was paid, and shares of common stock issued without the Board's

knowledge or approval. In addition, Defendant P. Pereira signed a certification to the Company's transfer agent falsely stating that the issuance of common stock in connection with the sponsorship agreement was authorized by the Board. In connection with the Investigation, the Company terminated the sponsorship agreement and obtained the return of 31,683 shares of common stock. Of the $320,000 in cash paid in connection with the sponsorship, $295,000 was converted to a charitable contribution and the remaining $25,000 was retained by the Tournament organizer.

96.     Furthermore, the Improper Transactions included agreements with three vendors. First, the Company entered into an agreement with an investor relations firm ("Vendor 1") to provide investor relations and strategic consulting services and capital introductions. The Company paid Vendor 1 $808,000, of which approximately $700,000 was in addition to the amounts required under the agreement. The Company also issued Vendor 1 150,000 shares of its common stock.

97.     The second agreement was with a consultant ("Vendor 2") to provide financial and business advice. Under this agreement, the Company issued Vendor 2 150,000 shares of its common stock. According to the Company's February 23, 2022 Form 8-K, "the Investigation could not determine what, if any, services were provided by Vendor 2 to the Company."

98.     The third agreement was with a start-up call center ("Vendor 3") to provide customer service, sales, and onboarding services. The Company paid Vendor 3 $343,642 for commission-based compensation and for reimbursement for preapproved costs or expenses, which expenses were not preapproved by the Company, according to the February 23, 2022 Form 8-K.

99.     As noted in the February 23, 2022 Form 8-K, shares of common stock were issued to Vendors 1 and 2 without the Board's knowledge or approval, but Defendant McIntosh signed certifications to the Company's transfer agent falsely stating that the issuances were authorized by

the Board.

100.    The Individual Defendants breached their fiduciary duties by causing or permitting the Company to engage in the Improper Transactions.

**Control Misconduct**

101.    As the Company investigated the Improper Transactions, Defendants P. Pereira, McIntosh, and C. Pereira engaged in the Control Misconduct by making false and misleading statements concerning the Company's operations and prospects, using Company resources without authorization, and obstructing the Investigation.

102.    For instance, in an interview with *Benzinga* occurring in or around June 2021, Defendant P. Pereira made statements announcing a $2 million share repurchase program. This announcement was made without the Board's knowledge or approval. *Benzinga* published an article on June 22, 2021, based in part on the interview, stating that the Company had announced the $2 million buyback plan. According to the Investigation's findings, Defendant P. Pereira also gave an online interview to *Benzinga* on June 15, 2021, in which he touted that over 22,000 rideshare drivers had "signed up" with the Company, even though such number reflected only the drivers who had expressed interest in applying to secure contracts and, as of June 2021, only 1,253 drivers had contracts with the Company.

103.    Additionally, social media posts made from an account created on Defendant P. Pereira's computer made inaccurate statements regarding the Company in touting the Company and its prospects. The username associated with the account did not identify Defendant P. Pereira or the Company.

104.    Furthermore, each of Defendants P. Pereira, McIntosh, and C. Pereira engaged in unauthorized use of the Company's computer systems or platforms after being placed on leave.

According to the February 23, 2022 Form 8-K, Defendant C. Pereira took control of, and prevented the Company from administering, its Google Workspace and its Amazon Web Services. He also obtained from Google "downloadable access to all data maintained in the Company's Google Workspace." According to the Investigation's findings, Defendant C. Pereira's interference "hindered and delayed, and increased the expense to the Company of, the Investigation." Similarly, Defendants P. Pereira and McIntosh accessed and downloaded files from the Company's Google Drive, despite having been instructed not to access the Company's computer systems or platforms.

105.    Defendants P. Pereira, McIntosh, and C. Pereira breached their fiduciary duties to the Company by engaging in the Control Misconduct.

**False and Misleading Statements Prior to the Relevant Period**

*Registration Statement*

106.    The Company filed the Registration Statement on January 8, 2021, which was subsequently amended seven times. The final amendment to the Registration Statement was filed on April 26, 2021, and the Registration Statement was declared effective on May 3, 2021.

107.    In the Registration Statement, the Company stated the following regarding its disclosure controls and procedures:

> Our disclosure controls and procedures are designed to reasonably assure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to management, recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC.

108.    The Registration Statement also stated the following regarding the Company's internal controls over financial reporting:

> Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles. In connection with this offering, we intend to begin the

process of documenting, reviewing and improving our internal controls and procedures for compliance with Section 404 of the Sarbanes-Oxley Act, which will require annual management assessment of the effectiveness of our internal control over financial reporting.

109.    The statements contained in ¶¶ 107–08 were materially false and misleading because the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company had engaged in the Improper Transactions; (2) Defendants P. Pereira, McIntosh, and C. Pereira had engaged in the Control Misconduct; (3) the Company failed to maintain adequate disclosure controls and procedures and internal control over financial reporting; (4) as a result of the foregoing, the Company faced an increased risk of internal and regulatory investigations; (5) once revealed, all of the foregoing was likely to have a material negative impact on Alfi's reputation, finances, and ability to timely file reports with the SEC. As a result of the foregoing, the Offering Documents were materially false and misleading.

### **False and Misleading Statements During the Relevant Period**

#### *May 5, 2021 Prospectus*

110.    On May 5, 2021, the Company filed its Prospectus, which formed a part of the Registration Statement.

111.    In the Prospectus, the Company stated the following regarding its disclosure controls and procedures:

> Our disclosure controls and procedures are designed to reasonably assure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to management, recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC.

112.    The Prospectus also stated the following regarding the Company's internal controls over financial reporting:

> Our internal control over financial reporting is a process designed to provide

reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles. In connection with this offering, we intend to begin the process of documenting, reviewing and improving our internal controls and procedures for compliance with Section 404 of the Sarbanes-Oxley Act, which will require annual management assessment of the effectiveness of our internal control over financial reporting.

### June 10, 2021 Form 10-Q

113.     On June 10, 2021, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2021 (the "1Q21 10-Q"). It was signed by Defendants P. Pereira and McIntosh and contained certifications, signed by Defendants P. Pereira and McIntosh, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

114.     The 1Q21 10-Q stated the following regarding the effectiveness of the Company's disclosure controls and procedures:

> Our Chief Executive Officer and Chief Financial Officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of March 31, 2021 (the "Evaluation Date"). Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that, as of the Evaluation Date, ***our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act (i) are recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (ii) are accumulated and communicated to management, specifically our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.***

(Emphasis added.)

115.     Regarding changes in internal control over financial reporting, the 1Q21 10-Q stated that "[t]here was no change in our internal control over financial reporting . . . that occurred

during the fiscal quarter ended March 31, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

### *August 16, 2021 Form 10-Q*

116.     On August 16, 2021, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2021 (the "2Q21 10-Q"). It was signed by Defendants P. Pereira and McIntosh and contained SOX certifications signed by Defendants P. Pereira and McIntosh attesting to the accuracy of the financial statements contained in the 2Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2Q21 10-Q stated the following regarding the effectiveness of the Company's disclosure controls and procedures:

> Management, specifically our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of June 30, 2021 (the "Evaluation Date"). Based upon that evaluation, the chief executive officer and the chief financial officer concluded that, as of the Evaluation Date, *our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act (i) are recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (ii) are accumulated and communicated to management, specifically our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.*

(Emphasis added.)

117.     Regarding internal changes in internal control over financial reporting, the 2Q21 10-Q stated that [t]here was no change in our internal control over financial reporting . . . that occurred during the fiscal quarter ended June 30, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

118.     Regarding an "Office Condo," the 2Q21 10-Q stated as follows: "The Company signed a contract to acquire additional office space for $1,100,000 in Miami Beach, FL on July 12,

2021. The purchase is expected to close late August." The foregoing statement was materially false and misleading because the Company's entry into the purchase contract for the Condominium was disclosed as a subsequent event, but at the time of filing on August 16, 2021 the Company had already completed the Condominium purchase on August 12, 2021.

119.     The statements contained in ¶¶ 111–18 were materially false and misleading because the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company had engaged in the Improper Transactions; (2) Defendants P. Pereira, McIntosh, and C. Pereira had engaged in the Control Misconduct; (3) the Company failed to maintain adequate disclosure controls and procedures and internal control over financial reporting; (4) as a result of the foregoing, the Company faced an increased risk of internal and regulatory investigations; (5) once revealed, all of the foregoing was likely to have a material negative impact on Alfi's reputation, finances, and ability to timely file reports with the SEC. As a result of the foregoing, Alfi's public statements were materially false and misleading at all relevant times.

120.     Indeed, the Company admitted in its February 23, 2022 Form 8-K that its internal control over financial reporting was deficient with respect to the disbursement process for third-party vendors, the review and approval process for significant vendor contracts, the use of Company credit cards by executives, the supervision of travel and entertainment expenses incurred by executives, the segregation of duties in connection with the payment and recording of invoices.

**The Truth Begins to Emerge While False and Misleading Statements Continue**

***October 28, 2021 Form 8-K***

121.     On October 28, 2021, after the market closed, Alfi filed a current report on Form 8-K with the SEC. The Form 8-K revealed that the Board had placed Defendants P. Pereira, McIntosh, and C. Pereira on administrative leave on October 22, 2021, and that Defendant C.

Pereira's employment had been terminated as of October 28, 2021. Specifically, the Form 8-K

stated as follows:

> On October 22, 2021, the Board of Directors (the "Board") of Alfi, Inc. (the "Company") placed each of Paul Pereira, the Company's President and Chief Executive Officer, Dennis McIntosh, the Company's Chief Financial Officer and Treasurer, and Charles Pereira, the Company's Chief Technology Officer, on paid administrative leave and authorized an independent internal investigation regarding certain corporate transactions and other matters.
>
> \*            \*            \*
>
> On October 28, 2021, Mr. C. Pereira's employment with the Company was terminated.

122.    On this news, Alfi's stock price declined $1.24 to close at $4.42 per share on

October 29, 2021, a loss of approximately 22%.

### November 1, 2021 Form 8-K

123.    On November 1, 2021, the Company filed a current report on Form 8-K with the

SEC, revealing the resignation of Friedman, the Company's independent registered public

accounting firm. The Company had retained Friedman on October 18, 2021—only fourteen days

earlier—to serve as its independent registered public accounting firm to audit the Company's

consolidated balance sheets as of December 31, 2021, and the related consolidated statements of

operations, comprehensive income, stockholders' equity, cash flows and related notes for the year

ended December 31, 2021.

124.    The November 1, 2021 Form 8-K also disclosed that Defendant Mowser had

resigned from the Board because, *inter alia*, he believed the Board's decision to replace Defendants

P. Pereira, McIntosh, and C. Pereira "in my opinion was personal and calculated and driven by

certain directors/shareholders to take control of the company without any regard for due process."

125.    Furthermore, the November 1, 2021 Form 8-K disclosed the following information

regarding the Improper Transactions, which had caused the Company to undertake the Investigation:

> The corporate transactions that precipitated the Board's actions to place the executives on paid administrative leave and to authorize the independent internal investigation included: (i) the Company's purchase of a condominium for a purchase price of approximately $1.1 million and the related erroneously certified corporate resolution regarding the unanimous approval by the Board and the Company's stockholders of such purchase, and (ii) the Company's commitment to sponsor a sports tournament in the amount of $640,000, a portion of which was payable through the issuance by the Company of unregistered shares of the Company's common stock, and as to which the Company would be obligated to pay additional cash amounts if the net proceeds received by the recipient upon the sale of such shares are less than an amount specified in the contract and for which the Company would be given a credit toward sponsorship or attendance at events in the future if the net proceeds received by the recipient upon the sale of such shares exceed an amount specified in the contract. (The Company's entry into the contract for the purchase of the condominium was disclosed in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2021.) *These transactions were undertaken by the Company's management without sufficient and appropriate consultation with or approval by the Board.* The independent internal investigation is expected to investigate the details of the above-noted transactions and any other matters that come to the Board's attention regarding actions taken by the executives in their management of the Company. *One of the goals of the independent internal investigation is to help the Company in developing improved corporate governance policies and procedures to ensure that the Board is provided the opportunity to consider and provide appropriate input to the Company's management on significant corporate transactions.* If, during the course of the independent internal investigation, the Board uncovers any wrongdoing, it will take appropriate action with respect to the person or persons responsible therefor.

(Emphasis added.)

126.    The statements contained in ¶¶ 124–25 were materially false and misleading because the Individual Defendants failed to disclose, *inter alia*, that: (1) Defendants P. Pereira, McIntosh, and C. Pereira had engaged in the Control Misconduct; (2) the Company faced an increased risk of regulatory investigation and enforcement; and (3) the foregoing, together with the Company's Investigation, was likely to have a material negative impact on Alfi's reputation, finances, and ability to timely file reports with the SEC. As a result of the foregoing, the

Company's positive statements were materially false and misleading at all relevant times.

**The Full Truth Emerges**

*November 15, 2021 Form 8-K*

127.     On November 15, 2021, after the market closed, the Company filed a current report on Form 8-K with the SEC. The November 15, 2021 Form 8-K stated that Louis A. Almerini had been appointed to serve as the Company's interim CFO, and it further revealed that the SEC had served the Company with a document retention request relating to, *inter alia*, the Improper Transactions:

> On November 9, 2021, ***the Company received a letter from the staff of the Securities and Exchange Commission (the "SEC") indicating that the Company, its affiliates and agents may possess documents and data relevant to an ongoing investigation being conducted by the staff of the SEC and notifying the Company that such documents and data should be reasonably preserved and retained until further notice. The materials to be preserved and retained include documents and data created on or after April 1, 2018 that:*** (i) were created, modified or accessed by certain named former and current officers and directors of the Company or any other officer or director of the Company; or (ii) ***relate or refer to the condominium or the sports tournament sponsorship identified in the Company's Current Report on Form 8-K filed on November 1, 2021,*** or financial reporting and disclosure controls, policies or procedures. The Company intends to cooperate fully with the SEC in this matter.

(Emphasis added.)

*Form NT 10-Q*

128.     Following the filing of the November 15, 2021 Form 8-K, Alfi filed a Form NT 10-Q (the "Form NT 10-Q") giving notice of the Company's inability to timely file its Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"). The Form NT 10-Q was accepted by the SEC after trading hours on November 15, 2021 and had a filing date and effectiveness date of November 16, 2021. In a narrative explanation for the Company's inability to timely file the 3Q21 10-Q, the Form NT 10-Q stated as follows:

> Alfi, Inc. (the "Company") is unable, without unreasonable effort or expense, to

39

file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2021 (the "Quarterly Report") by the November 15, 2021 filing date applicable to smaller reporting companies: (i) due to recent changes in the Company's Chief Executive Officer and Chief Financial Officer and in the Chair of the Audit Committee (the "Audit Committee") of the Company's Board of Directors (the "Board"); and (ii) because the Company has not yet engaged a new independent registered public accounting firm, which is needed to provide the required review of the Company's financial statements to be filed as part of the Quarterly Report.

129.    Following these disclosures, the price per share of the Company's stock declined $0.24, to close at $4.37 on November 16, 2021, a loss of approximately 5.2%.

130.    As of the filing of this action, the Company's common stock continues to trade at prices well below the IPO price of $4.15.

### Subsequent Developments

#### *February 23, 2022 Form 8-K*

131.    On February 23, 2022, the Company filed a current report on Form 8-K with the SEC announcing the findings of the Investigation. The Company stated that the Investigation was conducted by a special committee of the Board (the "Special Committee") consisting of non-party Allen Capsuto ("Capsuto"). The Special Committee retained outside counsel, who retained additional advisors to provide forensic accounting services, computer forensics and e-discovery services, and other legal services.

132.    According to the February 23, 2022 Form 8-K, the Investigation found that the Company's "former senior management" caused the Company to engage in the Improper Transactions. First, the February 23, 2022 Form 8-K described the purchase of the Condominium, Defendant P. Pereira's misconduct in signing a false certification attesting to Board approval, and Defendant P. Pereira's and Defendant McIntosh's misconduct in transferring the Condominium to an LLC they controlled:

> The Company's former senior management caused the Company to purchase a condominium in Miami Beach, Florida (the "Condominium") for a purchase price of approximately $1.1 million without the Board's knowledge or approval. ***In***

***connection with the purchase, Mr. P. Pereira signed a certification filed with Miami-Dade County which incorrectly stated that the Board and the Company's stockholders approved the purchase. Subsequently, the Condominium was transferred to a newly formed limited liability company (the "LLC") controlled by Messrs. P. Pereira and McIntosh, without the Board's knowledge or approval.*** During the Investigation Messrs. P. Pereira and McIntosh stated that the LLC was owned by the Company and was formed to serve as a special purpose entity in order to facilitate a loan for which the Condominium would serve as security; however, the Investigation found no documentary evidence with respect to the ownership of the LLC. ***The Company's entry into the purchase contract for the Condominium was disclosed as a subsequent event in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2021 (the "Form 10-Q"), although at the time of filing the Form 10-Q the Company had already completed the purchase of the Condominium on August 12, 2021.*** The Condominium has been transferred back to the Company, and the Company has commenced the process of selling the Condominium.

(Emphasis added.)

133.　The February 23, 2022 Form 8-K also described the Company's commitment to sponsor the Tournament, including Defendant McIntosh's role in signing a certification that falsely indicated that the Board had authorized the issuance of stock in connection with the sponsorship:

The Company's former senior management caused the Company to enter into an agreement to sponsor a sports tournament (the "Tournament") for two years, for a $640,000 sponsorship fee, which the Company paid $320,000 in cash and $320,000 through the issuance of 31,638 shares of Common Stock. The sponsorship agreement was executed, and the cash fee paid and the shares of Common Stock issued, without the Board's knowledge or approval. ***Mr. McIntosh signed a certification to the Company's transfer agent which incorrectly stated that such issuance was authorized by the Board.*** The Company has since obtained, in connection with the Company's termination of the sponsorship agreement, the return of the 31,683 shares of Common Stock. In addition, of the $320,000 in cash paid by the Company, $295,000 was converted to a charitable contribution and the remaining $25,000 was retained by the Tournament organizer.

(Emphasis added.)

134.　Furthermore, the Investigation found that Alfi's former senior management had caused the Company to enter into agreements with three vendors, and detailed Defendant McIntosh's role in signing certifications falsely attesting to Board approval of the issuance of stock in connection with the agreements with Vendor 1 and Vendor 2:

The Company's former senior management caused the Company to enter into agreements with three vendors: (i) an investor relations firm to provide investor relations and strategic consulting services and capital introductions ("Vendor 1"); (ii) a consultant to provide financial and business advice ("Vendor 2"); and (iii) a start-up call center to provide customer service, sales and onboarding services ("Vendor 3"). Under these agreements, the Company: (a) paid to Vendor 1 $808,000 (of which approximately $700,000 was in addition to amounts required under the agreement) and issued to Vendor 1 150,000 shares of Common Stock; and (b) issued to Vendor 2 150,000 shares of Common Stock, although the Investigation could not determine what, if any, services were provided by Vendor 2 to the Company. The shares of Common Stock were issued to Vendor 1 and Vendor 2 without the Board's knowledge or approval. **Mr. McIntosh signed certifications to the Company's transfer agent which incorrectly stated that such issuances were authorized by the Board.** Under the agreement with Vendor 3, the Company was to pay Vendor 3 for commission-based compensation (of which minimal commissions were earned or paid due to minimal sales) and to reimburse Vendor 3 for pre-approved costs or expenses. The Company paid to Vendor 3 $343,642, although the Investigation found no evidence that expenses were pre-approved by the Company.

(Emphasis added.)

135.    The February 23, 2022 Form 8-K also described the Investigation's findings regarding the Control Misconduct. For instance, the Investigation found that Defendant P. Pereira had made inaccurate and/or unauthorized statements concerning the Company, as follows:

> **On June 22, 2021, Benzinga published an article based in part on an interview given by Mr. P. Pereira. The article stated, among other things, that the Company announced a $2 million buyback plan. The disclosure to Benzinga of a share repurchase program by the Company was made without the Board's knowledge or approval.** The Board subsequently approved a share repurchase program by the Company for up to $2.0 million of shares of Common Stock on June 23, 2021. **In addition, Mr. P. Pereira gave an online interview to Benzinga on June 15, 2021, during which he stated that the Company had over 22,000 rideshare drivers "signed up"; however, the Investigation found that, at such time, such number of drivers had expressed interest in applying to secure contracts with the Company and, in June 2021, 1,253 drivers had contracts with the Company. Such statement was made without the Board's knowledge or approval.** The Company filed with the SEC on June 23, 2021, Current Reports on Form 8-K disclosing certain statements made in the Benzinga article and disclosing the Board's authorization and approval of the share repurchase program. The share repurchase program was also disclosed in the Form 10-Q.

(Emphasis added.)

136.    The February 23, 2022 also detailed the Investigation's findings regarding certain social media posts made from Defendant P. Pereira's computer:

> Certain social media posts (since removed from the platform) were made from an account created on Mr. P. Pereira's computer, using a user name that did not identify him or the Company and did not purport to be made by or on behalf of him or the Company. Certain of these posts touted the Company and its prospects, some of which posts the Investigation found included inaccurate statements regarding the Company. The social media posts were made from this account without the Board's knowledge or approval. Mr. P. Pereira denied making the social media posts.

137.    The false and misleading statements identified in ¶¶ 132–36 exposed the Company to the potential of liability in the Securities Class Action and in ongoing or future regulatory investigations or enforcement actions. As the Company itself noted in the February 23, 2022 Form 8-K, the Individual Defendants' misconduct exposed the Company to potential consequences as follows:

> ***Potential consequences of the Investigation and the other matters discussed in this Current Report on Form 8-K include, but are not limited to: the possibility that the Nasdaq may delist the Company's securities; the possibility that the SEC may bring an enforcement action against the Company; the possibility that the U.S. Department of Justice or other governmental authorities or regulators may commence, or have commenced, investigations into the facts underlying the Investigation; the consequences of any such investigations or actions, including the imposition of civil or criminal penalties; the risk that the Company may become subject to additional stockholder lawsuits;*** the impact on the Company's previously issued financial statements; and the effect of the Investigation and such other matters on the Company's conclusions regarding the effectiveness of internal control over financial reporting and disclosure controls and procedures and the Company's ability to become current in its filings with the SEC.

(Emphasis added.)

138.    The Investigation further found that, after being placed on leave and having been instructed at such time not to access the Company's computer systems or platforms, Defendants P. Pereira, McIntosh, and C. Pereira engaged in the following actions, constituting part of the Control Misconduct:

(i) Mr. C. Pereira (a) took control of, and prevented the Company from administering, its Google Workspace (which includes the Company's email accounts, calendars, contacts, chats and saved files) and its Amazon Web Services (which hosts tablet data and provides a platform for the Company's software development), and (b) obtained from Google downloadable access to all data maintained in the Company's Google Workspace; and (ii) Messrs. P. Pereira and McIntosh accessed and downloaded files from the Company's Google Drive. The Company was able to continue its business because it was able to implement "workarounds" with respect to the Google Workspace and Amazon Web Service lockouts described above. Mr. C. Pereira's interference with the Google Workspace hindered and delayed, and increased the expense to the Company of, the Investigation.

139.    The Investigation also found that the Company had deficient internal control over financial reporting, stating as follows:

The Investigation found the Company's internal control over financial reporting to be deficient with respect to: (i) the disbursement process for third-party vendors; (ii) the review and approval process for significant vendor contracts; (iii) the use of Company credit cards by executives; (iv) the supervision and approval of travel and entertainment expenses incurred by executives; (v) the segregation of duties in connection with the payment and recording of invoices and related bank reconciliations; (vi) the lack of a sufficient accounting manual; and (vii) guidelines for the capitalization of fixed assets.

140.    The findings of the Investigation set forth certain recommendations to enhance the Company's internal control over financial reporting, including: (1) maintaining a proper "tone at the top"; (2) enhanced controls for disbursements of funds for vendor invoices; (3) segregating duties across financial operations; (4) establishing a lockbox for customer payments; (5) developing a comprehensive accounting manual; (6) limiting the use of corporate credit cards; (7) maintaining a newly established travel and entertainment policy; (8) performing a fixed asset audit and establishing guidelines with respect to the future capitalization, maintenance and repair of such assets; (9) establishing a review and approval process for significant vendor contracts; and (10) retaining a consulting firm specializing in internal control implementation and design.

***March 11, 2021 Form 8-K***

141.    On March 11, 2021, the Company filed a current report on Form 8-K with the SEC.

The Form 8-K stated that the Company's previously issued audited financial statements for the years ended December 31, 2019 and 2020, included in the Company's Registration Statement, and the Company's previously issued interim financial statements included in the 1Q21 10-Q and 2Q21 10-Q should no longer be relied upon as a result of certain accounting errors. Specifically, the Company identified the following accounting errors, which in part related to certain bridge loans executed between the Company and certain Individual Defendants:

(i)   The Company incorrectly capitalized certain general and administrative expenses incurred during the years ended December 31, 2018, 2019, and 2020, and incorrectly included those costs in intangible assets in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021.

(ii)  The Company overstated the carrying value of tablets by incorrectly reporting them at cost with no allowance for depreciation, resulting in an overstatement of other assets (complimentary devices), net, in its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021.

(iii) The Company overstated total assets and total liabilities as of December 31, 2020, by incorrectly recording a note receivable (related parties) and a liability included in current portion of long-term debt (related parties). ***This note receivable represents a bridge loan provided to the Company by certain related parties that was executed in December 2020 but not fully funded until April 2021.***

(iv)  The Company did not recognize and report on its balance sheets as of December 31, 2019 and 2020, March 31, 2021, and June 30, 2021, an office lease in accordance with Financial Accounting Standards Board Accounting Standards Update No. 2018-11, Leases (Topic 842).

142.   The March 11, 2021 Form 8-K also noted that the Company suffered from a liquidity problem, noting that it "currently has very limited cash on hand," and that it was planning to sell the Condominium. In effect, the March 11, 2021 Form 8-K admitted that the Company's engagement in the Improper Transactions contributed to a liquidity issue. Specifically, the March 11, 2021 Form 8-K stated as follows:

Since its inception, the Company has generated only nominal revenue from customers and business activity and currently has very limited cash on hand. ***As a result, the Company intends to raise additional capital through the sale of the Company's condominium located in Miami Beach, Florida***, and through equity and debt financings. The Company and its management provide no assurance that such sale or financing transactions will be completed on terms favorable to the Company, or at all, or that, if completed, the proceeds therefrom will be sufficient to enable the Company to continue its development activities or sustain operations. The terms of any financing transactions that may be undertaken by the Company may adversely affect the holdings or the rights of the Company's stockholders.

If the Company is unable to raise sufficient additional capital, then it will be required to more aggressively manage its cash flow by extending payables, reducing overhead and scaling back its current business plan until sufficient additional capital is raised to support continued operations. There is no assurance that such efforts will be successful. Furthermore, if the Company is unable to raise sufficient additional capital, then the Company will be required to pursue other alternatives which may include selling assets, selling or merging its business, ceasing operations or filing a petition for bankruptcy (either liquidation or reorganization) under applicable bankruptcy laws.

(Emphasis added.)

### *April 1, 2022 Form NT 10-K*

143.    On April 1, 2022, Alfi filed a Form NT 10-K (the "Form NT 10-K") giving notice of the Company's inability to timely file its Form 10-K for the period ended December 31, 2021. The Form NT 10-K explained that the Company's review of prior period financial statements, including the determination of all required adjustments thereto, and the preparation of the restatements thereof, is ongoing. It further stated as follows concerning the Company's revenues, loss, and expenses for the year ended December 31, 2020:

The Company expects to report total revenues of approximately $25,000 for the year ended December 31, 2021, compared to total revenues of $0 for the year ended December 31, 2020. The Company expects to report a net loss of approximately $20 million for the year ended December 31, 2021, compared to a net loss of approximately $5 million for the year ended December 31, 2020. ***The increase in net loss was largely due to increased general and administrative expenses driven in part by higher compensation and benefits expense and increased professional services expenses, including additional expenses incurred during the quarter ended December 31, 2021 related to the Company's previously disclosed independent internal investigation.*** The foregoing figures are preliminary, unaudited, and subject to change in connection with the completion of the audit,

and are prepared in accordance with U.S. generally accepted accounting principles. (Emphasis added.)

**Repurchases**

144.    During the period in which the Company made false and misleading statements and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

145.    The 2Q21 10-Q stated that Alfi announced a $2 million buyback of its common stock on June 23, 2021. The buyback was completed on July 9, 2021, with the Company acquiring 137,650 shares at an average price of $14.5296 per share.

146.    As the Company's stock was actually worth only $4.37 per share, the price at closing on November 16, 2021, the Company overpaid by approximately $1.4 million for repurchases of its own stock completed on July 9, 2021.

**DAMAGES TO ALFI**

147.    As a direct and proximate result of the Individual Defendants' misconduct, Alfi has lost and will continue to lose and expend many millions of dollars.

148.    Such losses include the Company's overpayment by approximately $1.4 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

149.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Company's former CEO, former CFO, current CEO, CBDO, and five current or former Company directors, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

150.    Such expenditures include the costs of the Investigation undertaken by the Special

Committee, in which the Special Committee retained outside counsel, who retained additional advisors. This includes extra costs accrued due to the Control Misconduct, including Defendant C. Pereira's interference with the Company's Google Workspace, which the Company stated "hindered and delayed, and increased the expense to the Company of, the Investigation." This also includes the costs of implementing the necessary remedial measures identified by the Investigation.

151.    Such expenditures also include, but are not limited, payments made in connection with the Improper Transactions and the costs of recouping or seeking to recoup those payments. This includes, at a minimum: (1) the costs of acquiring the Condominium in Miami Beach for $1.1 million, reacquiring the Condominium after it was wrongfully transferred to an LLC, marketing the Condominium for sale, and any other associated costs; (2) payments of cash and stock in connection with the commitment to sponsor the Tournament in the amount of $640,000, as well as the costs with canceling the sponsorship and recouping a portion of the payments; and (3) payments made to Vendor 1, Vendor 2, and Vendor 3 and any costs associated with attempting to recoup those expenses.

152.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

153.    As a direct and proximate result of the Individual Defendants' conduct, Alfi has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

154.    Plaintiff brings this action derivatively and for the benefit of Alfi to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Alfi, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Section 11(f) of the Securities Act and Sections 10(b) and 21D of the Exchange Act.

155.    Alfi is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

156.    Plaintiff is, and has been at all relevant times, a shareholder of Alfi. Plaintiff will adequately and fairly represent the interests of Alfi in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

157.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

158.    A pre-suit demand on the Board of Alfi is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Bordes, Ficken, Lee, and Smith (the "Director-Defendants"), and non-parties Capsuto and Patrick Dolan ("Dolan," and together with Capsuto and the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to three of six Directors who are on the Board at the time this action is commenced.

159.    Demand is excused as to all of the Director-Defendants because each one of them

faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause and/or permit the Company to engage in the Improper Transactions, to allow Defendants P. Pereira, McIntosh, and C. Pereira to engage in the Control Misconduct, and to make and/or cause the Company to make false and misleading statements and omissions of material facts. The Company's own Form 8-K filed on November 1, 2021 discloses that the Improper Transactions "were undertaken by the Company's management without sufficient and appropriate consultation with or approval by the Board," thus confirming that the Director-Defendants and the other members of the Board then serving completely abdicated their fiduciary duties to the Company, including but not limited to the duty to exercise proper oversight over the Company's affairs. Furthermore, while the price of the Company's securities was artificially inflated due to the false and misleading statements and omissions of material facts, the Director-Defendants caused the Company to overpay by approximately $1.4 million for 137,650 shares of its own common stock. Moreover, the Investigation found that the Company had deficient internal control over financial reporting, demonstrating that the Director-Defendants failed to maintain internal controls during the Relevant Period. As a result of the foregoing, all four Director-Defendants are unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

160.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing schemes. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

161.    Additional reasons that demand on Defendant Bordes is futile follow. Defendant

Bordes served as a director throughout the Relevant Period and was appointed Interim CEO on October 22, 2021. Thus, he is a non-independent director. The Company provides Defendant Bordes with his principal occupation for which he receives handsome compensation, including a salary of $300,000. Defendant Bordes signed, and therefore personally made, the false and misleading statements in the Registration Statement, of which the Prospectus formed a part, as well as the false and misleading statements in the November 1, 2021 Form 8-K. As a trusted director during the Relevant Period, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Improper Transactions and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over financial reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. He also permitted Defendants P. Pereira, McIntosh, and C. Pereira to engage in the Control Misconduct despite early signs that something was amiss, including but not limited to Defendant P. Pereira's false and misleading statements in interviews with *Benzinga* in June 2022. Moreover, Defendant Bordes assumed the role of Interim CEO on October 22, 2021, and he therefore had ultimate responsibility for the false and misleading statements issued in the November 1, 2021 Form 8-K, which he signed. In addition, Defendant Bordes is a defendant in the Securities Class Action, where he faces a substantial likelihood of liability. For these reasons, Defendant Bordes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Ficken is futile follow. Defendant Ficken has served as a Company director since before the IPO, and she served on all three of the Board's committees during the Relevant Period, including as Chair of the Compensation Committee. As discussed above, Defendant Ficken was granted options to purchase shares of

common stock on the IPO's effective date. Defendant Ficken signed, and therefore personally made, the false and misleading statements in the Registration Statement, of which the Prospectus formed a part. As a trusted director with significant responsibilities on the Board, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Improper Transactions and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over financial reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. She also permitted Defendants P. Pereira, McIntosh, and C. Pereira to engage in the Control Misconduct despite early signs that something was amiss, including but not limited to Defendant P. Pereira's false and misleading statements in interviews with *Benzinga* in June 2022. In addition, Defendant Ficken is a defendant in the Securities Class Action, where she faces a substantial likelihood of liability. For these reasons, Defendant Ficken breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Lee is futile follow. Defendant Lee served as a Company director throughout the Relevant Period and assumed the role of Chairman on October 22, 2021. In addition, Defendant Lee is the founder, President, and CEO of Lee Aerospace, which beneficially held 36.9% of the Company after the IPO. As discussed above, Defendant Lee was granted options to purchase shares of common stock on the IPO's effective date. Defendant Lee signed, and therefore personally made, the false and misleading statements in the Registration Statement, of which the Prospectus formed a part. As a trusted Company director, and as Chairman for the latter portion of the Relevant Period, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Improper Transactions and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over

financial reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. He also permitted Defendants P. Pereira, McIntosh, and C. Pereira to engage in the Control Misconduct despite early signs that something was amiss, including but not limited to Defendant P. Pereira's false and misleading statements in interviews with *Benzinga* in June 2022. In addition, Defendant Lee is a defendant in the Securities Class Action, where he faces a substantial likelihood of liability. For these reasons, Defendant Lee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since before the IPO. During the Relevant Period, he served on all three of the Board's committees, including as Chair of the Nominating and Corporate Governance Committee. As discussed above, Defendant Smith was granted options to purchase shares of common stock on the IPO's effective date. Defendant Smith signed, and therefore personally made, the false and misleading statements in the Registration Statement, of which the Prospectus formed a part. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Improper Transactions and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over financial reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. He also permitted Defendants P. Pereira, McIntosh, and C. Pereira to engage in the Control Misconduct despite early signs that something was amiss, including but not limited to Defendant P. Pereira's false and misleading statements in interviews with *Benzinga* in June 2022. In addition, Defendant Smith is a defendant in the Securities Class Action, where he faces a substantial likelihood of liability. For these reasons, Defendant Smith breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.   Additional reasons that demand on the Board is futile follow.

166.   Demand in this case is excused because the Directors are beholden to and controlled by Defendant Lee, who controls Lee Aerospace as its founder, President, and CEO. According to the Prospectus, after the IPO, Lee and/or Lee Aerospace's holdings of Company common stock gave Lee and Lee Aerospace control over 36.9% of the Company. This control, together with Defendant Lee's position as Board Chairman, makes Defendant Lee a controlling shareholder. In light of this, the Directors cannot impartially consider a demand against Defendant Lee, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the lucrative compensation that goes with that; this is particularly true of Defendant Bordes, who receives substantial compensation for his service as Interim CEO. Thus, the Directors are unable to evaluate a demand with disinterest or independence due to Defendant Lee's control over them.

167.   The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendant Elkouri has served as the Chief Legal Officer for David Murfin and Murfin, Inc. since 2013, in which capacity he has led business transactions related to Lee Aerospace, which Director-Defendant Lee founded in 1986 and where Lee serves as CEO and President. Thus, Director-Defendant Lee cannot independently and disinterestedly investigate the misconduct described herein in which Defendant Elkouri is implicated.

168.   The business and personal relationships between the Director-Defendants and the

other Individual Defendants include certain loan agreements entered into by the Company. For instance, on December 30, 2020, the Company entered into a bridge loan agreement with Lee Aerospace and Defendants P. Pereira and McIntosh. On March 22, 2021, the Company entered into a second bridge loan agreement with Lee Aerospace, Defendant P. Pereira, and P. Pereira's wife. On April 1, 2021, the Company entered into a third bridge loan agreement with Lee Aerospace, Defendants P. Pereira, McIntosh, C. Pereira, and Bordes, as well as P. Pereira's wife. Defendant Bordes' and Defendant Lee's entry into one or more bridge loan agreements with the Company and Defendants P. Pereira, McIntosh, C. Pereira presented a conflict of interest. This conflict of interest precluded Defendants Bordes and Lee from adequately monitoring the conduct of Defendants P. Pereira, McIntosh, and C. Pereira in connection with the IPO and during the Relevant Period, each of whom is a primary wrongdoer and each of whom have had their employment terminated or have resigned in connection with the misconduct described herein.

169. The conflicts of interest presented by the business and personal relationships described in ¶¶ 167–68 precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

170. As discussed above, the Director-Defendants faced conflicts of interest due to business relationships developed through loan transactions with the Individual Defendants and with the Company. However, loan agreements executed prior to the IPO also demonstrate that Defendants Bordes and Lee had financial conflicts of interest that incentivized them to artificially inflate the price of the Company's common stock in the IPO and throughout the Relevant Period. As noted, Defendant Lee—through Lee Aerospace—and Defendant Bordes entered into loan agreements with the Company. The Company stated that it would use proceeds from the IPO to

repay: (1) $2.57 million plus accrued interest under a loan from Lee Aerospace; (2) $2.75 million plus accrued and unpaid interest on amounts advanced under the three bridge loans discussed above, to which Lee Aerospace and Defendant Bordes were each a party to one or more; and (3) up to $950,000 to acquire the balance of any Alfi-enabled tablets acquired by Lee Aerospace on Alfi's behalf that had not been acquired with the proceeds of the bridge loan, the remaining amounts being used for other purposes. Thus, due to the proposed use of the IPO proceeds for paying off the respective loans, Defendants Bordes and Lee were highly interested in seeing the IPO generate significant net proceeds to the Company; they were likely to suffer significant losses on their loans had the Company's IPO not gone well. They are therefore unable to independently and disinterestedly investigate misconduct relating to the IPO, particularly any misconduct that had the effect of artificially inflating the price of the Company's common stock.

171.    For the reasons stated in the foregoing paragraph, Defendants Bordes and Lee are also unable to independently and disinterestedly investigate misconduct relating to false and misleading statements made after the IPO. Specifically, the false and misleading statements in the 1Q21 10-Q and the 2Q21 10-Q touted the Company's disclosure controls, just as the false and misleading statements issued in the Offering Documents did. Thus, Defendants Bordes and Lee are also unable to independently and disinterestedly investigate the false and misleading statements in the 1Q21 10-Q and 2Q21 10-Q, due to the statements therein being substantively related to the misstatements in the Offering Documents. For all the foregoing reasons, demand upon Defendants Bordes and Lee is excused as being futile.

172.    Director-Defendants Ficken and Smith served as members of the Audit Committee during the Relevant Period. Under their direction and watch, the Company engaged in the Improper Transactions and Defendants P. Pereira, McIntosh, and C. Pereira engaged in the Control

Misconduct. Furthermore, under the direction and watch of Director-Defendants Ficken and Smith, the Company issued false and misleading statements or omissions of material fact in connection to the foregoing. Thus, in violation of the Audit Committee Charter, Director-Defendants Ficken and Smith failed, *inter alia*, to: (1) oversee the Company's accounting, financial reporting, and disclosure processes; (2) review major issues regarding the presentation of financial statements; (3) review significant financial reporting issues and judgments made in connection with the preparation of financial statements; (4) review internal controls over financial reporting and disclosure controls, including significant deficiencies or material weaknesses in the design or operation thereof; and (5) review fraud involving management or other employees. Accordingly, demand upon Director-Defendants Ficken and Smith is excused as being futile.

173.     In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public, the Company's engagement in the Improper Transactions, and Defendants P. Pereira's, McIntosh's, and C. Pereira's engagement in the Control Misconduct. Also in violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the scheme to facilitate and disguise these violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

174.     Alfi has been and will continue to be exposed to significant losses due to the

wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Alfi any part of the damages Alfi suffered and will continue to suffer thereby. Indeed, although the Board became aware of the misconduct as early as October 22, 2021, the most severe ramifications imposed consist of the termination of Defendant C. Pereira's employment and the resignation of Defendants P. Pereira and McIntosh from all of their positions at the Company. The lack of any further action by the Board against the Individual Defendants results in a failure to remedy the significant financial costs to the Company as a result of the misconduct. For instance, the wrongdoing of Defendants P. Pereira, McIntosh, and C. Pereira has exposed the Company to, at a minimum, the following: (1) costs associated with the $1.1 million purchase of the Condominium, the reacquisition thereof, and the subsequent attempted sale thereof; (2) costs associated with canceling a $640,000 commitment to sponsor the Tournament and the portion of that amount the Company was unable to recoup; (3) payments associated with agreements with Vendor 1, Vendor 2, and Vendor 3; and (4) expenses associated with an Audit Committee investigation, with which Defendant C. Pereira interfered. As a result of the foregoing, any demand upon the Directors would be futile, because the Board has already considered the wrongdoing described herein and failed to initiate action to recover on the Company's behalf, despite significant costs to the Company.

175.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As each of the Director-Defendants face a substantial likelihood of liability, they

are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

176. The acts complained of herein constitute violations of fiduciary duties owed by Alfi's officers and directors, and these acts are incapable of ratification.

177. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Alfi. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Alfi, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Board is futile and, therefore, excused.

178. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Alfi to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

179. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and

independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

180.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 179 above, as though fully set forth herein.

181.    Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith participated in a scheme to defraud with the purpose and effect of defrauding Alfi. Not only is Alfi now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Alfi by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the misconduct described herein, Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith caused the Company to repurchase 137,650 shares of its own common stock at artificially-inflated prices in a buyback completed on July 9, 2021, damaging Alfi.

182.    Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements and SEC filings.

183.    Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith employed devices, schemes and artifices to defraud while in possession of adverse, material, nonpublic information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements

made about Alfi not misleading.

184.    Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith, as controlling shareholder, top executives, and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as controlling shareholder, directors, and officers of the Company, they were able to and did control the conduct complained of herein and the content of the public statements disseminated by Alfi.

185.    Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith acted with scienter, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public primarily through press releases, interviews, conference calls, and filings with the SEC.

186.    By virtue of the foregoing, Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

187.    Plaintiff on behalf of Alfi has no adequate remedy at law.

## SECOND CLAIM

**Against Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith for Violations of Section 20(a) of the Exchange Act**

188.    Plaintiff incorporates by reference and realleges each and every allegation set forth

in paragraphs 1 through 179 above, as though fully set forth herein.

189.    Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith, by virtue of their positions with Alfi and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Alfi and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. Defendants P. Pereira, McIntosh, C. Pereira, Bordes, Cook, Ficken, Lee, Mowser, and Smith had the power and influence and exercised the same to cause Alfi and each other to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

190.    Plaintiff on behalf of Alfi has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 179 above, as though fully set forth herein.

192.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Alfi's business and affairs.

193.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

194.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Alfi.

195.    In breach of their fiduciary duties owed to Alfi, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or

omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company had engaged in the Improper Transactions; (2) Defendants P. Pereira, McIntosh, and C. Pereira had engaged in the Control Misconduct; (3) the Company failed to maintain adequate disclosure controls and procedures and internal control over financial reporting; (4) as a result of the foregoing, the Company faced an increased risk of internal and regulatory investigations; (5) once revealed, all of the foregoing was likely to have a material negative impact on Alfi's reputation, finances, and ability to timely file reports with the SEC. As a result of the foregoing, Alfi's public statements were materially false and misleading at all relevant times.

196.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

197.    The Individual Defendants breached their fiduciary duties by causing or permitting the Company to engage in the Improper Transactions.

198.    Defendants P. Pereira, McIntosh, and C. Pereira breached their fiduciary duties to the Company by engaging in the Control Misconduct.

199.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls, including but not limited to internal control over financial reporting.

200.    The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.

201.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was

engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Alfi's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

202.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

203.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Alfi has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

204.    Plaintiff on behalf of Alfi has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

205.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 179 above, as though fully set forth herein.

206.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Alfi.

207.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Alfi that was tied to the performance or artificially inflated valuation of Alfi, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

208.     Plaintiff, as a shareholder and a representative of Alfi, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

209.     Plaintiff on behalf of Alfi has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Abuse of Control

210.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 179 above, as though fully set forth herein.

211.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Alfi, for which they are legally responsible.

212.     This misconduct includes, but is not limited to, Defendant P. Pereira's, McIntosh's, and C. Pereira's engagement in the Control Misconduct.

213.     As a direct and proximate result of the Individual Defendants' abuse of control, Alfi has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.     Plaintiff on behalf of Alfi has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

215.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 179 above, as though fully set forth herein.

216.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of Alfi in a manner consistent with the operations of a publicly-held corporation.

217.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Alfi has sustained and will continue to sustain significant damages.

218.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

219.    Plaintiff on behalf of Alfi has no adequate remedy at law.

### SEVENTH CLAIM

**Against the Individual Defendants for Waste of Corporate Assets**

220.    Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 179 above, as though fully set forth herein.

221.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

222.    The Individual Defendants caused the Company to repurchase 137,650 shares of the Company's common stock at prices that were artificially inflated due to the false and misleading statements discussed herein.

223.    The Individual Defendants caused or permitted the Company to engage in the Improper Transactions, which exposed the Company to significant costs, including but not limited to costs associated with terminating the sponsorship of the Tournament and the inability to recoup all of the payments made in connection thereto; purchasing, reacquiring, and selling the Condominium; and fees and expenses paid to vendors pursuant to the Improper Transactions that the Company was unable to recoup.

224.    Defendants P. Pereira, McIntosh, and C. Pereira engaged in the Control Misconduct

which, *inter alia*, led to and unnecessarily increased the cost of the Investigation.

225. The Individual Defendants' misconduct resulted in the need for the Company to undertake the Investigation, which exposed the Company to significant costs, including costs associated with the retention of outside counsel and additional advisors for the provision of forensic accounting services, computer forensics, e-discovery services, and other legal services.

226. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Alfi to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

227. As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

228. Plaintiff on behalf of Alfi has no adequate remedy at law.

## EIGHTH CLAIM

### Against Defendants P. Pereira, McIntosh, Bordes, Cook, Elkouri, Ficken, Lee, Mowser, and Smith for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act

229. Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 179 above, as though fully set forth herein.

230. As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Alfi shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

231. Federal law provides Alfi with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

232.     The plaintiffs in the Securities Class Action allege that the Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

233.     Alfi is the registrant for the IPO. Defendants P. Pereira, McIntosh, Bordes, Cook, Elkouri, Ficken, Lee, Mowser, and Smith were responsible for the contents and dissemination of the Offering Documents.

234.     As issuer of the shares, Alfi is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

235.     The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

236.     Defendants P. Pereira, McIntosh, Bordes, Cook, Elkouri, Ficken, Lee, Mowser, and Smith, because of their positions of control and authority as controlling shareholder, officers, and directors of Alfi, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Alfi, including the wrongful acts complained of herein and in the Securities Class Action.

237.     Accordingly, Defendants P. Pereira, McIntosh, Bordes, Cook, Elkouri, Ficken, Lee, Mowser, and Smith are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

238.     As such, Alfi is entitled to receive all appropriate contribution or indemnification from Defendants P. Pereira, McIntosh, Bordes, Cook, Elkouri, Ficken, Lee, Mowser, and Smith.

## NINTH CLAIM

### Against Defendants P. Pereira and McIntosh for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

239.     Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 179 above, as though fully set forth herein.

240.     Alfi, Defendant P. Pereira, and Defendant McIntosh are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants P. Pereira's and McIntosh's willful and/or reckless violations of their obligations as officers and/or directors of Alfi.

241.     Defendants P. Pereira and McIntosh, because of their positions of control and authority as CEO and CFO of Alfi, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Alfi, including the wrongful acts complained of herein and in the Securities Class Action.

242.     Accordingly, Defendants P. Pereira and McIntosh are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

243.     As such, Alfi is entitled to receive all appropriate contribution or indemnification from Defendants P. Pereira and McIntosh.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Alfi, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Alfi;

(c)     Determining and awarding to Alfi the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Alfi and the Individual Defendants to take all necessary actions to reform and improve Alfi's corporate governance and internal procedures to comply with applicable laws and to protect Alfi and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Alfi to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Alfi restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: April 27, 2022                    Respectfully submitted,

**THE LAW OFFICE OF JOSE D. SOSA, P.C.**

*/s/ Jose D. Sosa*
Jose D. Sosa
Fla. Bar No. 150878
1141 Via Jardin
Palm Beach Gardens, FL 33418
Telephone: (516) 670-8237
Email: pepe@pepesosalaw.com
sosalaw@yahoo.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Ryan Dodgson am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty that the foregoing is true and correct. Executed this _th day of _____, 2022.

4/26/2022

_____
Ryan Dodgson